May it please the Court, Liliana Coronado on behalf of David Cantor. Also present at counsel table is Harlan Braun, counsel for the defendant in the related case in A. KOHIKI. We're combined and so I just wanted to let the Court know that I will be taking the first 10 minutes, we would divide the argument with 10 minutes, each of us would have 10 minutes. I would like to reserve a little bit of my 10 minutes for rebuttal so I'll take up about 8 minutes initially. I'd also like to start, Your Honor, with focusing on, as the Court knows, the procedural history in this case is somewhat complicated and I don't want to review it all but I would like to focus on the second issue that we raised in our brief which is the fact that the district court effectively denied Mr. Cantor a full and fair hearing on his motion for a new trial. When Judge Reel allowed the witness, essentially what this case comes down to is a conversation that Mr. Cantor had while incarcerated with one of the primary co-schemers in the fraud that's alleged in this case, John Sarabia. We call that in our brief the tapped conversation. That conversation was relayed in the form of Mr. Cantor's declaration to the district court and presented in the motion for a new trial. At the hearing on the motion for a new trial, Judge Reel did not allow Mr. Sarabia to testify even though he was present and even though he was subpoenaed. We submit that Mr. Sarabia no longer had a Fifth Amendment privilege against self-incrimination given that he had already been convicted, sentenced, and already served his time long before the hearing. And so, really, we believe the district court erred in three different ways with respect to the evidentiary hearing. The first way was to allow him to invoke the Fifth Amendment and not find that he had waived the right when he had pled guilty and when he had signed a cooperation agreement. Just as a reminder to the court, John Sarabia was a cooperator with the government and he had signed a 5K plea agreement. And so he was under an obligation to tell the truth in that plea agreement. The second way Judge Reel erred was that he allowed him to evoke the Fifth Amendment and he allowed him to blanket invocation of the Fifth Amendment. He, trial counsel asked Mr. Sarabia one question and the question was very innocuous. It was, were you incarcerated at Taft Correctional Institute? And immediately, Mr. Sarabia invoked the Fifth Amendment and said, I'd like to not answer or I refuse to answer. Judge Reel immediately came in and said, you know, told him to get off the stand. At that point, trial counsel tried to make an objection with respect to the fact that he no longer had a Fifth Amendment privilege, but also government counsel volunteered to go ahead and immunize this defendant and to look into immunizing this defendant, presupposing that he even had a Fifth Amendment right. But Judge Reel did not allow even that inquiry at all. That did seem unusual to me. What did the court say at that point? He said that they hadn't arranged for it beforehand and so he wasn't going to allow them to look at it, look into it now. I think the government counsel in that case had said that she would have to, of course, check upstairs, you know. I mean, she didn't specify a time period, but she said that I think it was specifically something like the government would be willing to look into that or would, of course, need to get approval from upstairs, meaning her opinion was that she didn't foresee a problem with that. And that makes sense. And I think they're taking a different position now on appeal, which is that, you know, he shouldn't – obviously, the district court did not err in that, and that perhaps they would not have gotten immunity for him, but the record there is clear that they were sort of in agreement with trial counsel about getting this person immunity. I think in the process of seeking that immunity, they would have realized that immunity from what? There was no longer a Fifth Amendment privilege there with respect to John Suravia. The district court's hearing, once again, Your Honor, what the district court then did was make factual findings and conclusions of law based on this very truncated and insufficient, in our opinion, hearing, and that was that he decided that it would not be material, that this person's testimony that he didn't allow to be heard would not have been material to the trial. And we obviously take issue with that because the evidence in Mr. Cantor's case was primarily circumstantial evidence. It was people who had observed him. There was no person involved in this alleged fraud that was able to bring in any statements of Mr. Cantor or any information about Mr. Cantor. And so John Suravia's testimony would have been crucial in that sense. Did your client make an offer of proof? Our client filed a declaration with respect to the conversation that he had with Mr. Suravia, and in that he relayed the conversation. What John Suravia told him was that he had informed the government prior to Mr. Cantor's trial that he had nothing to do with the fraud in the Century Group. So that was there. And so I think the parties knew what the circumstances were going to be. Obviously, it would have been fleshed out in greater detail in the hearing with respect to what he said, when he said it, why, you know, why he didn't tell him ahead of time, you know, different ways that we were hoping to be able to examine John Suravia. So there was information there about that. The case law with respect to the Fifth Amendment is such that there needs to be a basis by which the defendant may be or, excuse me, the witness may be incriminating himself. And in this case, no record was made about on what basis would John Suravia have had a Fifth Amendment privilege. There was a blanket invocation, as I mentioned earlier. And there was also no conversation about how he would have incriminated himself, having, I mean, as the Court knows, this trial was in 2003, and so this was long, long ago that he would have been convicted and sentenced and already served his time. I think we can also look at, yes, I think we can look at it as newly discovered evidence as well. Our first position is that it's new evidence because Mr. Suravia obviously, Mr. Cantor did not know of this conversation with the government beforehand, or else he would have subpoenaed him at the trial. But he found out about this after the fact, and that's why it constitutes newly discovered evidence, in our opinion, Your Honor. How do you square that with the Diggs case? Well, the Diggs case specifically discusses co-defendants. And this particular person, John Suravia, was not a co-defendant of Mr. Cantor. He was in a related case. And two things. One is that the reason that Mr. Cantor did not bring in John Suravia at trial is because he didn't know about this conversation and his exoneration because it wasn't reduced to a memorandum of interview with the government, by the government. And so I think that's different, where Mr. Cantor did not have a reason to believe, and in fact had all the reason to believe, that he would be incriminating him as a cooperator instead of exculpating him. And secondly, the second reason is that he was not his co-defendant. And although the district court doesn't even make an attempt to distinguish that and sort of just changes unilaterally the words in Diggs by saying a co-schemer cannot later come forward and exonerate the person, but he's not, the court's decision does not say co-schemer. It says co-defendant. And I think that it is a difference. When there's a rule that's limiting a defendant's ability to bring forth evidence, newly discovered evidence, as to their innocence, I think that it should be limited in a way. And the court decided in Diggs to limit it to co-defendants who are coming forth of their own volition to later exonerate someone. And you have about a minute plus left. Do you want to retain that for a rebuttal? I will, Your Honor. The last thing I'd say, yeah, I'll just rebuttal. Thank you. My name's Harlan Braun. I was a trial lawyer in the Kohiki case. I'm obviously not used to trying, being here. I'm more used to 12 people. Anyway, this particular ---- Well, we shrunk. Okay. Thank you. I'd like to do the same. Just pretend we're a jury. Right. Co-counsel take about 8 minutes. But don't argue to us like a jury. Right. Okay. This is a complicated case, but essentially it boils down to two new witnesses for Ms. Kohiki who's present in court here, and it also involves the conduct of the district court judge. Someone referred to the Diggs case. Now, one of the persons that we proffered as a new witness was Leo Sarabia, who was a co-defendant, so literally that we have to deal with the Diggs case. The other witness, John Sarabia, is not a co-defendant. He would be involved in a parallel scheme called sentry group. But let me talk about the Diggs case first. I believe the Diggs case doesn't apply in this case for a number of reasons because Mr. Leo Sarabia did not sit back and wait to be convicted to come forward later and then exonerate his co-defendant. He pled guilty to 18 of the 22 counts and basically offered the government and the court to submit the final four counts to the court for a matter of sentencing, which essentially is pleading guilty. And the government did not accept that, but he still pled guilty to 18 of the 22 counts, and he stood trial with Ms. Kohiki, and the only purpose was that, I believe, one of the reasonable inferences, so that he could not testify. Because the government knew that at the time he was arrested by the government agents, he specifically told them that Ms. Kohiki was not involved in the fraudulent scheme. And we also know that from his affidavit that during the trial period, he sent a letter to the trial judge, Judge Reel, telling the judge that Ms. Kohiki was not involved. That letter was never made available to the defense. I found no case that says that Brady applies to a trial judge, but it seems to make sense, common sense. The other thing about this case is that the reason Leo Sarabia's testimony was so critical was because John Sarabia, the co-schemer that we've been discussing, was specifically suppressed by the government from the trial, and if he had been allowed to testify, Ms. Kohiki would not have needed the testimony of Leo Sarabia. Now, let me just go into John Sarabia for a second. In the second motion for new trial, John Sarabia came in before Judge Reel under oath, while a cooperator, and while he was not sentenced, and told Judge Reel that he had told the U.S. attorney prior to Ms. Kohiki's trial that she was not involved. The agent, the agent submitted an affidavit saying that after that meeting, she was instructed by the U.S. attorney not to make a memorandum of that meeting. This was 30 days before trial. The attorney for John Sarabia came forward and testified under oath that he had been threatened by the U.S. attorney after the trial to withdraw the cooperation agreement with Mr. Sarabia because he didn't cooperate against Ms. Kohiki. And even the U.S. attorney in her affidavit said, well, he didn't say that she was not involved. She said, he said that she didn't have any knowledge of her involvement, and then the U.S. attorney said, well, you had to know because of your role in it. So under either the theory, either under Mr. Sarabia's view of the meeting or under Ms., the U.S. attorney's view. You're talking about John? John, yes. At this point. John. And the reason that ties into Leo is because had we had John, we wouldn't have needed Leo. And even under the U.S. attorney's view of the evidence, it was greatly immaterial. So what better evidence could you have? Now, this man is a hero in one sense. He was testifying adverse to the government while he still had a plea agreement, which was later threatened to be withdrawn from him. Now, what did Judge Reel after hearing all this evidence find? He says, all you've done is accuse and accuse and accuse. That's all you've done. The accusations that you make are totally without evidence, are totally without evidence. Now. Counsel, what evidence do we have that John was aware of what Kahiki was up to? Well, because, see, John was the one who originally set up the schemes. Leo was the brother. And he would be in and out of the, they were working together. And Leo was the one who really worked with Kahiki. directly. But also they were together at all times. And he was a co-schemer. So they, conspirators know who the conspirators are. They would have to, for example, they'd have to be careful not to talk around Kahiki about the fraud. So it was obvious that John and Leo Sarabia both knew whether Kahiki was involved. So the other thing about it is the testimony of Leo was corroborated by John's testimony. So we have another reason that I don't think that Diggs applies. But the real interesting one is, is that Leo says that the reason he didn't testify at the trial was because of the behavior of Judge Reel. And that is manifest that Judge Reel, if you look at, and we've asked the Court to look at some of the earlier briefs on the first appeal. I mean, Judge Reel viciously cross-examined Kahiki. He asked her whether or not the other witnesses were lying. Was screaming at her. And finally says, after excusing the jury, you have to give it to her in plain language. And if someone testifies here that something happened and she says it didn't happen, that's a lie. That's the kind of abuse that Miss Kahiki, her mother, I took at the trial. There's no rational person in Leo Sarabia's position that would dare take the stand in front of Judge Reel knowing that he faced sentencing by Judge Reel. So, I mean, the government says that, well, this would swallow up all the exceptions in Diggs. No, it doesn't. This Court on the previous appeal already decided that it was misconduct. They just somehow found that it was cured. How, I don't know, because the opinion doesn't set forth what he says or the curative instructions. And, of course, you have to remember that if the curative instruction goes the next day in a jury in Judge Reel's court, the jury is not allowed to take any notes. They're not allowed any readback. So how they could figure out what a judge means when he says, well, yesterday I asked a few inappropriate questions and I'm the witnesses. So that's what Leo Sarabia was facing. Now, Diggs, before I get back to John, let's talk about Diggs for a second. Diggs, they say, is controlling. But what does Diggs say? Diggs quotes a number of other cases that say that a defendant is chosen not to testify and that's a bunch of cases. The leading case would be Jacobs, which Judge Friendly supposedly said that. He didn't say that. He said that they should be viewed with skepticism. Of course it should be viewed with skepticism. So let's look at Rule 33. When Congress passed Rule 33, did it say co-defendants can't be newly discovered evidence? Would any court rule that if a co-defendant came forward with credible evidence, that the co-defendant who was convicted may be facing a death penalty, they could exonerate them beyond any doubt that that couldn't be newly discovered evidence? I mean, that's beyond belief. Now, what you do have in all these cases are 95 percent of these claims are bogus. They're  Now, let's look at what it says, because even the Diggs case says first it quotes that, but then it goes on to say there was a lack of due diligence on the part of the appellant. Well, what do you mean lack of due diligence? If a co-defendant can't be newly discovered evidence, are lawyers supposed to go out and interview co-defendants? That would be silly. Then they say that there's no showing that the testimony would have probably resulted in an acquittal. Well, if co-defendants can't be newly discovered evidence, we shouldn't even get into that issue, should we? We would say we don't care what the co-defendants said. We don't care how credible they are. We're not going to allow them. We'd rather have innocent people convicted than have the gaps in logic that you suggest in Diggs that you do have the ultimate standard of the probably resulting in acquittal. And would you address that? Yeah. In this case, this was a very close case. Remember, she was charged with 22 counts. She was acquitted of all the counts except three. The counts that she was convicted of were all related to a single bank. Is that right? A single organization? Right. She was convicted of Pacific Bank, a count of three, but not all of the counts on that one. The jury came back three times for more instructions. There was no direct evidence that she knew. The scam was this. Leo Sarabia would advertise that for $300 you could get a credit card. People would send in credit cards from the bank, the processing centers and so forth. So the whole issue was whether Ms. Kohiki knew that this, that there was no credit cards being sent out. It's a very simple thing. Everything else you do with the business is consistent with, you know, innocence. You're working the phones. You're doing whatever you're doing. So this is a case where we even submitted to the judge's discretion, you know, letters of character, polygraphs, everything to convince the judge that this motion for a new trial should be granted on the assumption that that is more open. So this is a very close case. But we also have the fact that John Sarabia, one of the co-schemers, and Leo Sarabia both say she wasn't part of it. So John Sarabia was willing to come in against his own best interests and swear to that under oath in front of Judge Reel. And it was dismissed out of hand. He was promised 12 months' sentence by the government, a recommendation. He ended up with 41 months. I'm confused. I'm sorry. Where is – what is it that John Sarabia says about Kohiki? Well, it's – what it is is – what John Sarabia said about Kohiki, there's four motions for new trial. The first one was based on – So what did John Sarabia say about Kohiki? That she was not involved in the fraud. Okay. And this is in what? That would be in the second motion for new trial. Okay. Where did he say that? I'm just – can you give me the page in the record? Yeah. Here's the problem with that, is that the – that is in the first appeal, and we reiterated it in the second. Because what we do – Counsel, I'm asking for a page. Can you give me the page where John Sarabia said Kohiki was not involved? Let's see. We – Is it in his declaration? No. It's in testimony. He testified before Judge Reel in the second motion for new trial. We refer to it in page 10 of our reply brief, footnote 6. And it refers to the record there. So that's – I mean, Judge, I was astounded. When I heard and knew what the evidence was, it just was beyond my comprehension that a judge could not grant a motion for new trial. I mean, even if he wanted to cover for the U.S. attorney and say it's not a – it was a mistake, how could you have that kind of testimony? And what's very interesting is later, when John Sarabia was sentenced, the U.S. attorney took the position that he fully cooperated and stuck with the 12-month recommendation, even though they said earlier that he committed perjury in front of Judge Reel. Now, why would they do that? I think they did it because of Cantor, because they did not want to open up the ball – the can of worms, because they knew there was a similar meeting involving Cantor. Where John Sarabia is brought in, about ready to try David Cantor, and he tells the U.S. attorney he's not involved. Then Cantor gets convicted. John Sarabia, the cooperator, is not even called in to either trial. Now, why would you make a deal for 12 months with the main co-schemer and not call him in either trial? Counsel, I thought that your principal argument was that John Sarabia's declaration was the – was newly discovered evidence. Oh, yeah. There's two things. The declaration is newly discovered evidence. Yeah, but that doesn't relate to Kohiki, does it? It does, indirectly, because he was – It doesn't – does it mention Kohiki any place in there? No, no, it doesn't. Okay. That's the Cantor. That's the – that really is the Cantor. No, no, yes – yes and no. Remember, in the Kohiki trial, they introduced – the prosecution introduced evidence about Kohiki's supposedly involvement with Century Group. Which is not convicted of Century Group. That's right. So it doesn't matter. Yes, yes, it doesn't. Why does that one matter? Because it shows a common MO. In other words, that John Sarabia and Leo Sarabia set up businesses where they put people in positions where you would think that they would know and lie to them. So it's a relevance of the similarity of the structure. Right. And the reason we know it is because that's what the government claimed at the trial. They put a motion in to introduce evidence that she had been over at Century Group even though she didn't work there. And – because they socialized after they broke up. So that's why we took the position with respect to the new evidence on John Sarabia involving Century Group that we didn't know about either. So essentially we're – Let's hear from the government. Thank you. May it please the Court. Curtis Kin on behalf of the United States, who is the plaintiff appellee in this matter, the consolidated appeals. Cutting to the heart of the matter, the one reason why the new trial motions were properly denied, as well as the Brady motions, is the fact that ultimately there's been no showing that the district court was wrong in finding that the results wouldn't have changed, that there would have likely been an acquittal or that the results would have been different. The evidence in these cases was overwhelming as to the guilt of both Kohiki as well as to Mr. Cantor. Kohiki's guilt was – and it's really not even disputed in the briefs that the evidence was overwhelming here. Eleven employee witnesses testified in the Kohiki trial that she was the wife and girlfriend of Leo Sarabia, that she was the manager, partner, and vice president of Pacific Bancorp, that she ran and operated the mail rooms, that she had employee interactions and hired and trained employees, that she handed out leaves to the employees, that she handed out paychecks to the employees, that she was very and fully aware of the customer complaints, that after paying $300, no credit cards were being sent out. As to Kohiki, all of that evidence came in, but she was convicted on only one related bank, correct? Yes. Of the three scams, she was convicted – and I think as Judge Vibey was earlier pointing out, she was convicted consistently with respect to the operation of Pacific Bancorp for the period of September of 2000. And all of the evidence I've just described went towards that conviction. I haven't described any evidence that had to do with the accounts for which she was acquitted. Right. So would you – the statement that – to which Mr. Sarabi testified before Judge Reel, that she, meaning Ms. Kohiki, was not involved, why would that not have changed the calculus with respect to the conviction? Well, that's the funny thing, Your Honor. That was already the subject of the second new trial motion, which was denied by the district court, in which this court already on the first appeal of Ms. Kohiki affirmed. So really we're talking about whether the so-called new evidence that somehow a different defendant and a different scheme, David Cantor, that John Sarabi's statement that David Cantor was involved, whether that has any bearing on Ms. Kohiki's innocence. Okay. So let me just want to unpack the various statements. It's your view that the Sarabi statement specific as to Ms. Kohiki is not involved in this appeal? Correct, Your Honor. That was already denied. And if previously it's already been found that when John Sarabi said that Ms. Kohiki was innocent or wasn't involved and that was rejected, it certainly stands to reason that is even that much more unpersuasive and irrelevant than when John Sarabi comes forward and says a different defendant. Because the only thing he testifies to is as to Cantor, which is not particularly related to her. Yes, Your Honor. And strangely, that is the new evidence that Ms. Kohiki is offering here as the basis for why the result would have changed for her. It's very strange, I would admit. With respect to John Sarabi's statements then as to Cantor, again, the same result would have obtained. Acquittal was not likely. Cantor's guilt was established by a very credible testimony of employees of the fraud who said that he was an equal partner with Leo Sarabi and the business, that he directed the day-to-day activities of the employees, that he was responsible for closing deals, that he directed telemarketers to forge third-party signatures on documents and also did so himself, that on one instance at least he laughed off customer complaints. There were also at least two victims whose testimonies we've described in our briefs who testified that they spoke directly with Mr. Cantor. And indeed, one of them had spoken to a Robert Millett who also testified at trial who was a friend of Mr. Cantor who testified at trial that he was Mr. Cantor's friend and he was told and paid by Mr. Cantor to pretend that he had invested in the business to encourage other investors to put money in. That's undisputed evidence. And then, of course, then there was Cantor's own false testimony about his responsibilities and what he did at the Century Group. And indeed, Mr. Cantor's testimony was so false, in fact, that he even denied having met with a potential investor and her daughter who was an undercover FBI agent. And that, again, was refuted. So essentially, even the district court found at sentencing is, I have never in my experience in 37 years on the bench ever heard anybody lie so facilely and so much. So it cannot be then that John Sarabia coming forward at this time would have changed the result. And for these reasons, then the new trial motion should be denied and the Brady claim should be – was properly denied. Even if the court doesn't want to engage in that weighing and calculus as to whether the result would have changed. Frankly, what's being offered here with respect to the new trial motions is not newly discovered evidence, both in the case of Leo Sarabia's declarations as well as John Sarabia's declarations. I think this court held squarely in Diggs that statements or that testimony of co-defendants is not newly discovered evidence. It's very interesting how the appellants characterized it as an extension of the so-called rule in Diggs. But quite frankly, all Diggs did was clarify the very longstanding approach to Rule 33, which is that in order for evidence to be – to get a new trial, it has to be new. And it has to be new insofar as it was reasonable – it was discoverable through reasonable diligence of the defendants. All that Diggs clarified is, by the way, the claim that testimony of a co-defendant was new because previously that co-defendant wouldn't testify because of Fifth Amendment concerns, that doesn't render it new. So this distinction that the appellants are trying to advance, that co-schemers ought to be treated differently, simply just – it makes no sense because still a co-schemer would have that exact same reason for not testifying previously, which would be the assertion of Fifth Amendment privileges. And so the so-called extension of Diggs, if that's what one wants to characterize it, is proper here. So again, the Leo and John Staravia declarations simply are not new evidence that could be – that should be considered. Briefly, I should talk about the fact that also no Brady violation occurred here. After an evidentiary hearing, the district court found hearing from the prosecutor who was subject to cross-examination and hearing from the case agent who was subject to cross-examination that John Staravia never said that Mr. Cantor was involved in the New Century Group. And indeed also subject to cross-examination who testified at the evidentiary hearing was Mr. John Staravia's attorney. He said, look, the memorandum of interview that were produced by the government in the litigation were accurate. And nowhere in those memorandum of interview do they indicate that John Staravia said, by the way, David Cantor wasn't involved in the New Century Group. So no Brady violation occurred here. Starting then finally with the argument that somehow the district court – that a remand is necessary here because the district court purportedly committed some error with respect to John Staravia's testimony in the March 2006 hearing. Let me start by first is that the idea that the district court didn't allow John Staravia to testify is absolutely erroneous. It was John Staravia who elected to assert his Fifth Amendment privilege. And again, putting aside the fact that it wasn't the blanket invocation of the Fifth Amendment, it was up to the defense counsel then I think to ripen the issue and ask appropriate questions to show that the Fifth Amendment was improvidently or improperly invoked. And moreover, even if there were a remand, there's no showing necessarily that the district court was necessarily wrong or that it could have – that an appropriate or proper showing by the defense could have been made to immunize. What about the – after the invocation of the Fifth and whether it was proper or not to take effectively a blanket invocation, what about the situation where the prosecution is willing to offer immunity to the witness and the judge just says, you know, no, we're not going to give you time to do that? If one looks at the transcript, Your Honor, quite frankly, that's not precisely what happened. Definitely one of the government counsels said, look, we can look into immunity. Let me go upstairs, but I need approval. Immediately on the heels of that, the other government prosecutor says, wait a minute. Before we go down that road, let me hear a proffer by the defense as to what it is that John Staravia is going to say. And I think that's the heart of the matter, is it doesn't really matter whether John Staravia was or was not going to be immunized and what he was going to say because the district court, as we started – as I started off my argument, properly denied these motions because whatever – what John Staravia would have said, even according to the defense proffers, wouldn't have made a difference. It wouldn't have made acquittal likely. And so whether or not there was an error with respect to stopping the proceedings or maybe they should have continued it and should have litigated the immunity issue, it doesn't matter. At the end of the day, the new trial motions wouldn't have and were properly not granted, as well as the Brady motions, is because the result wouldn't have changed. The – What was the proffer? The proffer is a single – first, with respect to David Cantor, well, the proffer is by David Cantor is a single sentence that something to the effect of – and it was wholly conclusory that – that David Cantor had no involvement or didn't know of the fraud in the New Century Group. That was the proffer. And quite frankly, if that's the proffer and that was the best that the defense would have hoped to have gotten had there been immunity and had John Staravia testified, that would, again, not have changed the result because that would have been inadmissible evidence at any trial. Under Rule 602, and as this Court found in Coupow and in other cases, the fact of the matter is that commentary on what another defendant thought, especially with respect to a fraud, is wholly irrelevant and inadmissible. So, again, the proffer – and that's, again, I think the proffer, I would assume, is defendants' best hope of what the so-called new evidence would have shown. It wouldn't have made a difference, Your Honor. One last thing. With respect to the notion that Leo Staravia's declaration with respect to Kohiki is newly discovered evidence, again, the Diggs case, I think, makes it very clear that it ought not to be newly discovered. And moreover, what I would suggest to this Court is, in fact, Ms. Kohiki was speaking to Mr. Leo Staravia. She knew what he was going to testify to. As I was looking through the record last night, in fact, at Cantor Excerpt of Record 593, is a memorandum of Mr. Leo Staravia's post-arrest statement. Long before trial, Leo Staravia was trying to, or made statements to, exculpate his then-girlfriend or wife or whatever the relationship was. And so this could not be, in any scope of the imagination, newly discovered evidence, even without the Diggs case. Unless the Court has any other questions, I would submit. Thank you. Thank you, Your Honor. If the clerk could put the clock at a minute and a half, I think you had some time. Thank you, Your Honor. Briefly, I just want to touch on a few things. But going back to Diggs, Your Honor, and why this Court is not bound by Diggs in this particular case, this is not a case where John Staravia is coming forward of his own He's actually not willing to come forward and discuss what he told Mr. Cantor at Taft. And that is why he invoked the Fifth Amendment, we believe, improperly. This isn't a case where the policy concerns in Diggs and in Reyes-Alvarado are implicated. We have a co-defendant. A, you don't have a co-defendant. B, where you have somebody coming forward willingly to say, now that I'm done, now that it's long over, let me ---- But, counsel, the Fifth Amendment questions will arise in many cases where we have co-defendants. And the question here under Rule 33 is whether there's something new here, something that your defendant could ---- that your client couldn't have discovered. And I'm struggling to try and figure out why your client couldn't have discovered that co-schemers and co-defendants might have some information that might be relevant. Well, this particular ---- And that shouldn't come as a surprise to anybody, should it? You're ---- I understand the Court's concern, Your Honor. But this particular co-defendant, excuse me, co-schemer, had not given this information to the government ahead of time. And our point is that the government should not be able to benefit from this Brady violation of not disclosing this information to the defense by then saying, well, he should have brought him at trial. You're talking about two different things. You're talking about a Brady problem. You're talking about a new evidence. And those are two very different concerns. So are you concerned about Brady or are you concerned about new evidence? We're concerned about both, and we raised both in our brief. Our first position is that there was a Brady violation in not disclosing this conversation ---- excuse me, this information from John Surabia. But even if the Court finds that there is a Brady violation, we believe that it newly discovered evidence because Mr. Cantor could not have known this information with ---- would not have known that a cooperator, a government witness, was going to come in and exonerate him at his trial. Well, that's right. He won't know what Surabia would have been willing to testify if Surabia is willing to testify. The problem is, is that at trial he's not. He's going to invoke his Fifth Amendment rights. But the problem is, is that it's not like he doesn't know that Surabia is out there. He newly discovered evidence, presumably sort of a Perry Mason, here's the witness that everybody had been hoping would come forward, and this is not a surprise that Mr. Surabia might have some relevant information. It's a surprise that he's ---- it's not a surprise that he's not ---- that he was out there, but it's a surprise, a huge surprise that he would come forward and be honest and say that Mr. Cantor did not know about the fight in the century group. So I think it was reasonable for his trial counsel to assume that as a cooperator who had been proffering for about a year with the government against everybody else, that he would not be willing to come forward and exonerate Mr. Cantor. I think that was a reasonable call on his trial counsel's part. Thank you. Thank you, Your Honor. Although we let you go over quite a bit, we'll give you a minute for rebuttal if you can be brief. I think it's important to understand the relationship. In other words, we raised the Leo Surabia, that's the third motion for new trial, and made the arguments there that it was manipulation that prevented us from getting Leo Surabia, and that would take it outside of the issue about whether it's newly discovered, because it was government manipulation that prevented us from getting him. But with respect to John Surabia's declaration about Cantor, we basically used that and argued that that reopened the issue of John Surabia with respect to Kohiki, because it is further confirmation of a modus operandi. How could it reopen something that's already been ruled on on appeal? Well, there's two things. One is that if you look at the appeal, the opinion, you can't figure out what was said, other than the fact they just affirmed Judge Reel. They didn't say what they said. But it was fully and fairly presented to a panel of this Court. Is that right? That's correct. But now when we have the evidence about the same modus operandi with respect to John Surabia and Cantor, we argue that we have to revisit the other evidence that we had earlier, because it changed it. Now you have the government doing the same thing with respect to a parallel defendant. Okay. I think we have your argument in mind. Thank you. Thank you. The case of United States v. Kohiki and Cantor is submitted.
judges: B. Fletcher, McKeown, Bybee